[No. D021277. Fourth Dist., Div. One. June 22, 1995.]

THE PEOPLE, Plaintiff and Respondent, v.
ANTHONY BROWN, Defendant and Appellant.

## COUNSEL

Patrick J. Hennessey, Jr., under appointment by the Court of Appeal, and Elizabeth A. Barranco for Defendant and Appellant.

Daniel E. Lungren, Attorney General, George Williamson, Chief Assistant Attorney General, Gary W. Schons, Assistant Attorney General, M. Howard Wayne and Laura Whitcomb Halgren, Deputy Attorneys General, for Plaintiff and Respondent.

## OPINION

**WORK, Acting P. J.**—Anthony Brown appeals a judgment after a jury convicted him of second degree murder of a human fetus (Pen. Code,[1] § 187, subd. (a)) and assault by means likely to produce great bodily injury (§ 245, subd. (a)(1)). He contends section 187 is unconstitutional as applied to his case; the trial court erred in failing to instruct the jury on the lesser included offense of manslaughter; the trial court erred in admitting testimony regarding his prior inconsistent statements when the witness/victim conceded the discrepancy; and, his conviction for second degree murder is not supported by the evidence. As we shall explain, we conclude his arguments are meritless and, accordingly, affirm the judgment.

### FACTUAL AND PROCEDURAL BACKGROUND

On September 21, 1993, around 3 p.m., Mia Jackson went to Brown's apartment to recover property and money he owed her. She had been dating Brown off and on for four years, but had recently terminated the relationship. She was in her eighth month of pregnancy at the time. While at Brown's apartment, Jackson telephoned her friend Hollie Davis and made plans to have their fingernails done. While she was on the telephone, Brown looked at her pager and saw a code number 85, the number for Tarik Fagan, a friend whom Jackson had been "seeing" "off and on" during the past year. Brown became outraged, yelling at her and asking why Fagan was calling her. Apprehensive, she tried to leave the bedroom, but he pushed her to the

---

[1] All statutory references are to the Penal Code unless otherwise specified.

floor and began to kick her all over her body, including her stomach. She climbed on the bed and tried to reach the telephone, but he snatched it away. He kicked her again in the stomach and other parts of her body as she lay on the bed. When she reached for the telephone again, he took it and hit her in the nose, causing her nose to bleed. Throughout the attack, Brown called her names like "stupid bitch" and "dumb bitch." He twice said, "I'll kill you and your mom." He also stated: "This is what you get." He also declared: "Fuck that baby. I don't care if you need to go to the bathroom. After I finish kicking your ass, you're going to be going to the bathroom on yourself." He told her to quit crying so loud, that "there ain't nothing wrong with you."

He eventually allowed her to leave. She picked up Davis who observed she had been crying and inquired what was wrong, but Jackson declined to tell her and drove home. When she went inside, her mother found her bent over and crying, with blood on her pants. In response to her mother's questions, she said Brown had hit her and kicked her in the stomach. She requested to be taken to the hospital.

The examining obstetrician/gynecologist, Dr. Lynda McHutchison, saw a large bruise on her left arm and two red, very tender areas on her abdomen. An ultrasound revealed the baby had no heartbeat and was dead. From the condition of the skull sutures and skin, it was apparent the baby had not been dead for very long. Jackson told Dr. McHutchison she had last felt the baby move around 3 p.m. that day. She delivered a stillborn baby boy. The delivery doctor determined there was a 30 to 50 percent abruption of the placenta (i.e., a premature separation). This was significant and was one cause of death, due to lack of nutrients and oxygen for the baby. In other words, the baby asphyxiated.

Dr. Mark Super, a deputy medical examiner, determined the second cause of death was a blow to the baby's skull, which resulted in a five-centimeter bruise. It would have required a significant amount of force to cause this injury, because the baby is cushioned by amniotic fluid, the uterus and the abdominal wall. Both Dr. McHutchison and Dr. Super agreed kicks or punches to the abdomen could have caused the injuries. Such serious injuries are typically seen in motor vehicle accidents or severe homicidal episodes involving guns or knives. Although "possible," they opined it would not be likely such injuries could arise from a trip and fall, with someone landing on top of her or she landing on a box edge.

At the hospital, Jackson consistently told several people, including her mother, doctor, friends and police officers, Brown had beaten and kicked her. After she was released from the hospital, however, she began to talk on

the telephone with the jailed Brown. On October 1, she told her mother it did not happen the way she had first described and Brown had not kicked her, but rather they had struggled and she fell and landed on her "butt." By the time of trial, Jackson and Brown were living together. She testified she had attacked Brown because she was jealous he was seeing another woman. Her anger was triggered by a telephone call he had received from "Nickie." Jackson grabbed the phone from him, but the line was silent. Jackson threw the telephone at him and hit, kicked and tried to scratch him for one and one-half hours. During the attack, she pulled him off the bed and they fell to the floor, with Brown on top of her. Later, when she tried to lunge at him, she fell and hit her stomach on some boxes. She said her prior accusations against him were lies which she had told because she was hurt by rumors he had been "messing around."

An investigating officer took photographs of Brown the day after the incident. He saw some recent scratches on his arm which were not deep. No other injuries were apparent. Jackson spoke to a friend, Michelle Ivory, by telephone during trial and requested her to testify she has previously had nose bleeds. Brown also offered Ivory $100 to come to court to testify to that effect.

By information filed November 2, 1993, Brown was charged with murdering a human fetus, assaulting Jackson by means likely to produce great bodily injury (§ 12022.7), and inflicting injury upon a pregnant woman resulting in termination of the pregnancy (§ 12022.9). A prior serious felony conviction for robbery (§§ 667, subd. (a), 1192.7, subd. (c)(19)) was also alleged. Following a jury trial, the jury found Brown guilty of second degree murder of a fetus and assault by means likely to produce great bodily injury. Although the jury found untrue the great bodily injury allegation, it made a true finding on the allegation of injury to a pregnant woman. Brown admitted the prior serious felony conviction. On May 27, he was sentenced to 20 years to life, including 15 years to life for second degree murder and a consecutive 5-year term for the prior serious felony conviction. The court ordered a three-year middle term for the assault and a five-year enhancement for injury to a pregnant woman to run concurrently with the twenty years to life term.

### THE TRIAL COURT PROPERLY DID NOT INSTRUCT ON MANSLAUGHTER

Brown asserts the trial court erred in not instructing the jury, sua sponte, on the lesser included offense of manslaughter. Citing *People* v. *Carlson* (1974) 37 Cal.App.3d 349 [112 Cal.Rptr. 321], holding the manslaughter statute (§ 192) did not apply to death of a fetus, the trial court

determined there exists no crime of manslaughter of a fetus and thus did not instruct regarding manslaughter. Relying on *People* v. *Davis* (1994) 7 Cal.4th 797 [30 Cal.Rptr.2d 50, 872 P.2d 591], Brown argues the Supreme Court has tacitly overruled its prior decision of *Keeler* v. *Superior Court* (1970) 2 Cal.3d 619, 625-631 [87 Cal.Rptr. 481, 470 P.2d 617, 40 A.L.R.3d 420], which held the term "human being" within section 187 meant a person who had been born alive and did not include an unborn fetus and which prompted the Legislature to amend the definition of murder in section 187 to include unlawfully killing a fetus with malice aforethought. Consequently, Brown contends the *Davis* definition that a viable fetus constitutes a human being renders superfluous the statutory and judicial attempts to define a fetus in section 187, thus permitting the application of section 192 and the lesser included offense of manslaughter to fetal homicide.

Section 192 defines manslaughter as "the unlawful killing of a human being without malice." Similarly, until 1970, section 187 defined murder as "the unlawful killing of a human being with malice aforethought." However, in response to *Keeler* v. *Superior Court, supra*, 2 Cal.3d at pages 625-628, where the Supreme Court held a man who killed a fetus by hitting his estranged wife and kneeing her in the abdomen could not be prosecuted for murder under section 187 because the Legislature intended the phrase "human being" to mean a person who had been born alive, the Legislature amended that section by adding in the disjunctive "fetus." (Stats. 1970, ch. 1311, § 1, p. 2440; see *People* v. *Davis, supra*, 7 Cal.4th at pp. 802-803.) The legislative history of that amendment reveals "the omission of the word 'fetus' from section 192 . . . was not due to legislative oversight; it was the exercise of legislative judgment." (*People* v. *Apodaca* (1978) 76 Cal.App.3d 479, 491 [142 Cal.Rptr. 830], disapproved on other grounds in *People* v. *Davis, supra*, 7 Cal.4th at pp. 804, 810.) Although the amendment originally proposed modification to the manslaughter statute as well, the legislative decision not to amend section 192 to include fetus was consistent with the Senate debate that the unlawful killing of a fetus should be governed solely by the murder statute due to a defendant's extreme culpability, rendering section 192 inapplicable to the crime of fetal homicide. (Comment, *Is the Intentional Killing of an Unborn Child Homicide? California's Law to Punish the Willful Killing of a Fetus* (1970) 2 Pacific L.J. 170, 172-175, 181.) Consequently, in *People* v. *Carlson, supra*, 37 Cal.App.3d at page 355, the Court of Appeal held in light of the statutory scheme, "the unlawful killing of a human being or a fetus with malice aforethought is murder, but only the unlawful killing of a human being constitutes manslaughter." (Fn. omitted.) Similarly, in *People* v. *Apodaca, supra*, 76 Cal.App.3d at page 491, the court acknowledged there existed in California no statutory crime of manslaughter of a fetus and the courts cannot create a " 'nonstatutory crime' by judicial fiat [citations], not even to satisfy a constitutional mandate."

Brown's reliance on *People* v. *Davis*, *supra*, 7 Cal.4th 797, for the proposition it "tacitly" overruled *Keeler*, rendering the resulting legislative amendment to section 187 to include feticide superfluous and the unanimous judicial interpretation section 192 is inapplicable to feticide moot, is misplaced. In *Davis*, our Supreme Court, with only Justice Mosk dissenting, rejected the contention viability of a fetus is an element of fetal homicide. (7 Cal.4th at pp. 800, 810, 818.) The majority concluded: "when the mother's privacy interests are not at stake, the Legislature may determine whether, and at what point, it should protect life inside a mother's womb from homicide. Here, the Legislature determined that the offense of murder includes the murder of a fetus with malice aforethought. (§ 187, subd. (a).) Legislative history suggests 'fetus' was left undefined in the face of divided legislative views about its meaning. [Citation.] Generally, however, a fetus is defined as 'the unborn offspring in the postembryonic period, after major structures have been outlined.' (Sloane-Dorland Ann. Medical-Legal Dict. (1987) p. 281.) This period occurs in humans 'seven or eight weeks after fertilization' (*ibid.*), and is a determination to be made by the trier of fact. Thus, we agree with the above cited authority that the Legislature could criminalize murder of the postembryonic product without the imposition of a viability requirement. We need not address whether different concerns might apply to an embryo." (*People* v. *Davis*, *supra*, 7 Cal.4th at p. 810.) Thus, the Supreme Court did not define "fetus" to be the equivalent of "human being," rendering the word "fetus" in section 187 superfluous. Rather, it concluded the Legislature did not intend to limit the crime of fetal murder to only viable fetuses. Moreover, the court expressly recognized the Legislature has the exclusive province to define by statute what acts constitute a crime (§ 6), "find[ing] no impediment to our Legislature protecting the 'potentiality of human life' from homicide." (*People* v. *Davis*, *supra*, 7 Cal.4th at p. 810.)

Finally, contrary to Brown's assertion, the court's correct refusal to instruct on manslaughter did not deprive him of his right to a jury trial on the issue of his mental state. In *People* v. *Apodaca*, *supra*, 76 Cal.App.3d at pages 491-492, the Court of Appeal rejected the same argument, declaring: "[U]nder section 187, if a killing of a fetus is committed with malice aforethought, the crime is murder, either in the first or second degree. However, if, because of a diminished mental capacity, there was no malice aforethought (absent a permissible application of the felony-murder rule), the killing of a fetus is neither murder nor any other criminal homicide. It is patent that under proper instructions to the jury, a person accused of murdering a fetus can have his actual mental state on the issue of malice fully assessed, even though manslaughter of a fetus is not a lesser and included offense of that statutory crime. It is also patent that the foundation for appellant's belief that jurors will ignore the court's instructions and

inevitably convict a person accused of a murder of a fetus because there is no lesser and included offense of manslaughter to fasten onto is grounded upon nothing more than conjecture; he has presented no statistics or other demonstrable evidence to support the thesis that juries do not follow the court's instructions on the law, but establish their own ad hoc standards of culpability. It must be presumed that the jurors observed and applied the instructions given them. [Citations.]" (Fn. omitted.) Here, given the jury was properly instructed (CALJIC Nos. 8.10 [murder—defined], 8.11 [malice aforethought—defined], 8.31 [second degree murder—killing resulting from unlawful act dangerous to life] and 8.55 [homicide—cause—defined]), we are similarly persuaded.

## SECTION 187 IS CONSTITUTIONAL AS APPLIED HERE

■ Brown alternatively contends if the manslaughter instructions are not applicable, then section 187 is unconstitutional as applied. Casting aside the fact that this claim was not raised at trial, we conclude Brown's contention is meritless, because the jury did have the opportunity to fully evaluate his mental state and presumably did so.

Again, as did the defendant in *People* v. *Apodaca, supra,* 76 Cal.App.3d at pages 490-492, Brown challenges the "all-or-nothing approach taken by the California homicide law on the subject of unlawful killings of unborn children." However, as already explained, the court in *Apodaca* specifically rejected the claim, finding baseless the defense theory the jury would disregard proper instructions and find him guilty of murder only because no alternative lesser offense was available. (*Id.* at p. 492.) The court further declared: "Appellant having failed to present any applicable empirical data refuting the validity of such a presumption [that jurors observe and apply the instructions given them], asks us to speculate that he is being denied his constitutional right to a fair trial, and other similar constitutional rights, because of the absence of a crime of manslaughter of a fetus. As we stated earlier, the denial of a constitutional right resulting in essential unfairness must be established as a demonstrable reality, not as a matter of speculation." (*Id.* at p. 492, citing *Darcy* v. *Handy* (1956) 351 U.S. 454, 462 [100 L.Ed. 1331, 1337-1338, 76 S.Ct. 965], *People* v. *Perez* (1973) 9 Cal.3d 651, 660-661 [108 Cal.Rptr. 474, 510 P.2d 1026].)

Brown's argument the jury "very likely" would have found manslaughter if given the opportunity because it made a not true finding regarding the allegation he personally inflicted great bodily injury on Jackson is similarly unavailing. That finding is not inconsistent with the fetal murder conviction because the requisite mental states are different. In other words, Brown may

not have had the specific intent to personally inflict great bodily injury on Jackson[2] and yet may have acted with implied malice toward the fetus.[3] In fact, implied malice was evident here by Brown's intentional conduct of kicking and punching Jackson, the natural consequences of which were dangerous to fetal life, a danger recognized but consciously ignored by Brown, as demonstrated by his comment: "Fuck that baby." To convict him of second degree murder, it was not necessary for the jury to conclude he intended his acts to result in the death of the fetus. Consequently, given the facts as we shall discuss later, the jury convicted Brown of murder not as the result of the absence of manslaughter instructions, but rather the result of the evidentiary record.

### THE TRIAL COURT DID NOT ABUSE ITS DISCRETION IN ADMITTING TESTIMONY REGARDING JACKSON'S PRIOR INCONSISTENT STATEMENTS

Brown next asserts the trial court erred in admitting the testimony of witnesses to whom Jackson had described Brown's attack on her, because Jackson conceded at trial that, although she had made the previous statements, they were lies. As we shall explain, we conclude Jackson's prior inconsistent statements were properly admitted pursuant to Evidence Code sections 1235 and 770 and the trial court did not abuse its discretion in overruling Jackson's counsel's Evidence Code section 352 objection.

At trial, Jackson sought to bar the testimony of several witnesses who could describe Jackson's prior statements Brown had repeatedly kicked and punched her. The defense strategy was to ask Jackson on cross-examination about her previous statements, expecting her to acknowledge them but explain they were lies. Under such circumstances, Brown argued the other statements were not inconsistent and therefore were hearsay. Brown also contended his ability to confront Jackson would be limited, because she could not be effectively cross-examined on statements she now claimed were lies. Finally, he objected to the evidence as repetitive under Evidence Code section 352. The trial court denied the motion, explaining under Evidence Code sections 1235 and 770 the prosecution was entitled to present the

---

[2]The jury was properly instructed pursuant to CALJIC No. 17.20 that in order to make a true finding on the allegation of intentional infliction of great bodily harm, it must determine "whether . . . such defendant, with the specific intent to inflict such injury, did personally inflict great bodily injury, on Mia Jackson in the commission of Count Two."

[3]The jury was also correctly instructed pursuant to CALJIC No. 8.11, providing:
"Malice is implied when:
"1. The killing resulted from an intentional act,
"2. The natural consequences of the act are dangerous to the life of a viable human fetus,
"3. The act was deliberately performed with knowledge of the danger to, and with conscious disregard for, the life of a viable human fetus."

evidence of prior statements in one of two ways: by asking Jackson about them and allowing her to explain them, or simply keeping her available for further testimony and bringing on other witnesses to describe her prior inconsistent statements. Although the defense would be permitted to ask Jackson about the statements during cross-examination, that stratagem would not preclude the prosecution from presenting the testimony of other witnesses. The court similarly overruled the Evidence Code section 352 objection, finding any cumulative effect was not outweighed by probative value. As the court explained, the whole case turned on the jury deciding which of Jackson's statements were truthful. "[A]ny witness on the issue of what Mia Brown [Jackson] said or didn't say is going to go to the heart of the case, so I don't see how it could be cumulative on this issue." Consequently, during direct examination in the case-in-chief, Jackson gave her trial version of her injuries, that she was the aggressor who attacked Brown out of jealousy; that she threw the telephone at Brown and hit, kicked and tried to scratch him for an hour and a half; that during the attack, she pulled him off the bed and they fell to the floor with Brown on top of her; and that when she tried to lunge at him, she fell and hit her stomach on some boxes. Brown cross-examined Jackson about her prior statements, causing her to explain she had told lies to doctors and police about him hitting and kicking her. Over defense objections, the prosecution brought out Jackson's prior statements through the testimony of Dr. McHutchison, Laureen Jackson, Officers Dunn and Anderson, Tarik Fagan, Hollie Davis and Michelle Ivory.

Before the statutes governing the admissibility of prior inconsistent statements were enacted in 1965, such statements were admissible only to impeach trial testimony and could not be employed as evidence of the truth of the matter stated. (Cal. Law Revision Com. com., 29B West's Ann. Evid. Code, § 1235 (1966 ed.) p. 221.) The enactment that year of Evidence Code section 1235[4] changed the law, permitting inconsistent statements to be used as substantive evidence, so long as the requirements of Evidence Code section 770[5] were satisfied. The change was the result of the California Law Revision Commission's conclusion "the dangers against which the hearsay rule is designed to protect are largely nonexistent" in that particular situation. The commission emphasized not only is the declarant in court and may

---

[4]Evidence Code section 1235 provides: "Evidence of a statement made by a witness is not made inadmissible by the hearsay rule if the statement is inconsistent with his testimony at the hearing and is offered in compliance with Section 770."

[5]Evidence Code section 770 provides:

"Unless the interests of justice otherwise require, extrinsic evidence of a statement made by a witness that is inconsistent with any part of his testimony at the hearing shall be excluded unless:

"(a) The witness was so examined while testifying as to give him an opportunity to explain or to deny the statement; or

"(b) The witness has not been excused from giving further testimony in the action."

be questioned about the statement, but the inconsistent statement is more likely to be true because it was made nearer in time to the events in question and the declarant was less likely to be influenced by outside factors such as litigation. Moreover, the trier of fact can observe the demeanor of the declarant. Finally, the commission noted "[Evidence Code section] 1235 will provide a party with desirable protection against the 'turncoat' witness who changes his story on the stand and deprives the party calling him of evidence essential to his case." (Cal. Law Revision Com. com., 29B West's Ann. Evid. Code, § 1235 (1966 ed.) p. 221.) ■ Evidence Code section 1235 does not violate a defendant's constitutional witness-confrontation rights by permitting the admission of prior inconsistent statements as substantive evidence. (*California* v. *Green* (1970) 399 U.S. 149, 164 [26 L.Ed.2d 489, 500, 90 S.Ct. 1930]; *People* v. *Chavez* (1980) 26 Cal.3d 334, 361 [161 Cal.Rptr. 762, 605 P.2d 401].)

■ Evidence Code section 770 expressly provides two alternative methods for presenting prior inconsistent statements of "either that the declarant be provided an opportunity to explain or deny the statement or that he [or she] be kept available for further testimony" (*People* v. *Freeman* (1971) 20 Cal.App.3d 488, 495 [97 Cal.Rptr. 717]), both of which were followed here. Not only did the prosecutor introduce the statements, but she also kept Jackson available, who was recalled by both the prosecution and the defense.

Jackson's prior statements are clearly "inconsistent" with her trial testimony. That character does not change simply because she admitted making them. Her testimony she injured herself in falls while she was the aggressor, attacking Brown and denying he ever hit or kicked her, conflicts with her earlier statements to the contrary.

Similarly, the trial court did not abuse its discretion in overruling the Evidence Code section 352 objection, finding the testimony of the multiple witnesses was not unduly cumulative. Preliminarily, whether Jackson's prior statements to her mother, friends, doctors and police were true governed the outcome of this case. The jury could not evaluate and compare these statements based simply on Jackson's brief claim she had lied in telling others Brown had hit and kicked her. Rather, the compelling nature of the prior statements was the graphic detail and consistency in which she related the circumstances to others. Consequently, evidence Jackson repeated these prior inconsistent statements to several persons is a relevant factor for the jury to consider in determining their credibility.

## SUBSTANTIAL EVIDENCE SUPPORTS THE SECOND DEGREE FETAL MURDER CONVICTION

■ Brown finally contends his second degree murder conviction is not supported by substantial evidence, as the record fails to show he knew his described assaultive behavior was likely to cause death to the fetus. However, as we shall explain, the record amply supports the jury's finding of implied malice and second degree murder.

■ When reviewing the sufficiency of the evidence underlying the conviction, our inquiry is limited to whether any rational trier of fact could have found the necessary elements of the crime beyond a reasonable doubt. (*People* v. *Rich* (1988) 45 Cal.3d 1036, 1081 [248 Cal.Rptr. 510, 755 P.2d 960]; *People* v. *Caro* (1988) 46 Cal.3d 1035, 1050-1051 [251 Cal.Rptr. 757, 761 P.2d 680].) We review the record in its entirety when making that determination, viewing the evidence in the light most favorable to the prosecution. (*Jackson* v. *Virginia* (1979) 443 U.S. 307, 316-320 [61 L.Ed.2d 560, 571-574, 99 S.Ct. 2781]; *People* v. *Ochoa* (1993) 6 Cal.4th 1199, 1206 [26 Cal.Rptr.2d 23, 864 P.2d 103]; *People* v. *Jones* (1990) 51 Cal.3d 294, 314 [270 Cal.Rptr. 611, 792 P.2d 643].) In other words, ". . . the court must review the whole record in the light most favorable to the judgment below to determine whether it discloses substantial evidence—that is, evidence which is reasonable, credible, and of a solid value—such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt." (*People* v. *Johnson* (1980) 26 Cal.3d 557, 578 [162 Cal.Rptr. 431, 606 P.2d 738, 16 A.L.R.4th 1255].) Thus, we " 'presume in support of the judgment the existence of every fact the trier could reasonably deduce from the evidence.' " (*Id.* at p. 576, quoting *People* v. *Mosher* (1969) 1 Cal.3d 379, 395 [82 Cal.Rptr. 379, 461 P.2d 659]; *People* v. *Rich, supra,* 45 Cal.3d at p. 1081.)

■ Second degree murder may be predicated upon a finding of implied malice, when the circumstances surrounding the killing reveal an abandoned and malignant heart. (§ 188.) "In other words, implied malice may be found when a defendant, knowing that his or her conduct endangers life and acting with conscious disregard of the danger, commits an act the natural consequences of which are dangerous to life." (*People* v. *Roberts* (1992) 2 Cal.4th 271, 317 [6 Cal.Rptr.2d 276, 826 P.2d 274].) Thus, where the evidence establishes " 'a wanton disregard for life, and the facts demonstrate a subjective awareness of the risk created, malice may be implied.' [Citation.]. . . ." (*People* v. *Contreras* (1994) 26 Cal.App.4th 944, 955 [31

Cal.Rptr.2d 757], quoting *People* v. *Watson* (1981) 30 Cal.3d 290, 298 [179 Cal.Rptr. 43, 637 P.2d 279].)[6]

 Here, the jury was presented with evidence of an unprovoked attack by Brown upon Jackson, triggered by a telephone call reflected on her pager. He repeatedly kicked, hit and punched the pregnant Jackson in the stomach as well as other places on her body. The testimony established the damage caused, including a 30 to 50 percent separation of the placenta and a five-centimeter bruise to the skull of the fetus, was similar to that produced by automobile accidents and severe homicidal events. Brown's declarations "Fuck that baby" and "I'll kill you" evidenced his complete disregard for the harm he was causing both to Jackson and the fetus. Regardless whether the governing standard be his knowledge of the natural consequences of his acts were dangerous to fetal life or his recognition of the "high probability of death" to the fetus, his intentional, callous and repetitive kicking and punching of a pregnant woman in her abdomen while yelling he neither cared about the baby nor her supported the jury's conclusion he acted with conscious disregard of the danger to fetal life he was causing. The evidence amply supports his conviction.

## DISPOSITION

The judgment is affirmed.

Huffman, J., and Nares, J., concurred.

Appellant's petition for review by the Supreme Court was denied September 27, 1995.

---

[6]Brown relies on a disfavored definition of implied malice in that the danger created by a defendant's act must be one that carries with it "a high probability of death." Rather, the preferred definition describes implied malice as arising when " 'a person does an act, the natural consequences of which are dangerous to life, which act was deliberately performed by a person who knows that his conduct endangers the life of another and who acts with conscious disregard for life. . . .' " (*People* v. *Nieto Benitez* (1992) 4 Cal.4th 91, 104 [13 Cal.Rptr.2d 864, 840 P.2d 969], quoting *People* v. *Watson, supra*, 30 Cal.3d at p. 300.) Here, the trial court instructed the jury as to this definition in CALJIC Nos. 8.11 and 8.31, which were approved by the Supreme Court in *People* v. *Dellinger* (1989) 49 Cal.3d 1212, 1222 [264 Cal.Rptr. 841, 783 P.2d 200].