[No. C036614. Third Dist. Feb. 4, 2005.]

THE PEOPLE, Plaintiff and Respondent, v.
ELISIO VALDEZ, Defendant and Appellant.

[No. C037039. Third Dist. Feb. 4, 2005.]

THE PEOPLE, Plaintiff and Respondent, v.
JOHNNIE RAY PERAZA, Defendant and Appellant.

**[CERTIFIED FOR PARTIAL PUBLICATION\*]**

---

*Pursuant to California Rules of Court, rule 976.1, this opinion is certified for publication with the exception of the Facts and Procedural Background and parts II through XIV.

576

## COUNSEL

Charles M. Bonneau, under appointment by the Court of Appeal, for Defendant and Appellant Elisio Valdez.

Cliff Gardner, under appointment by the Court of Appeal, for Defendant and Appellant Johnnie Ray Peraza.

Bill Lockyer, Attorney General, Robert R. Anderson, Chief Assistant Attorney General, Jo Graves, Assistant Attorney General, Stephen G. Herndon and David Andrew Eldridge, Deputy Attorneys General, for Plaintiff and Respondent.

## OPINION

**SCOTLAND, P. J.**—Defendants Elisio Valdez and Johnnie Ray Peraza were convicted of various crimes, including the murders of Andrea Mestas and her fetus, the premeditated attempted murder of Ronny Giminez, and the false imprisonment and aggravated assault of Nancy Davis. The crimes were committed at separate times and in separate places. The prosecutor theorized that defendants went to Mestas's apartment intending to kill her boyfriend on orders from the Nuestra Familia, a prison gang. The prosecutor also presented evidence that the Nuestra Familia considered Mestas to be a "rat" and a "snitch." As to the motive for the Giminez shootings and the crimes against Davis, who was defendant Peraza's girlfriend, evidence indicated that Peraza was upset because Davis had been seeing Giminez, the father of three of her children.

Defendant Valdez was sentenced to multiple life sentences, plus a determinate term of 11 years and 8 months in prison. Defendant Peraza received multiple life sentences, plus a determinate term of 14 years in prison. On appeal, they raise numerous claims of error.

In the published part of this opinion, we reject defendants' claim that (1) California's murder statute does not apply to the killing of a fetus that, even absent criminal intervention, would not have survived until birth due to a fatal physical or medical condition, and thus (2) the trial court erred in excluding evidence that Mestas's fetus suffered from such a condition. As we will explain, just as the murder statute protects human beings who are suffering from fatal conditions and have little time to live, it protects fetuses with fatal conditions.

In the unpublished parts of our opinion, we conclude that other contentions also lack merit. However, we shall correct sentencing errors.

### FACTS AND PROCEDURAL BACKGROUND*

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

### DISCUSSION

### I

Andrea Mestas was shot in the chest at very close range. A bullet perforated her heart and killed her. During the autopsy, Dr. Sally Fitterer determined that Mestas was 16 to 17 weeks pregnant with a male fetus, which perished as a result of Mestas's death.

In challenging their convictions for murdering a fetus, defendants contend the trial court erred by excluding evidence that, if there were no shooting, Mestas's fetus would not have survived past the second trimester because of a fatal medical condition.

This contention is based on the following evidence that defendant Valdez sought to introduce at trial. Microscopic examination of the placenta revealed areas of "focal necrosis or cell death." Placental autopsy slides were sent to a pathologist, who found considerable chronic inflammation of the implantation site—where the placenta attaches to the uterine wall—as well as acute inflammation of the membranes surrounding the fetus. The pathologist and Dr. Fitterer opined that the infection made it unlikely the fetus would have survived to term in utero. According to Dr. Fitterer, problems would have developed in the second trimester.

Defense counsel claimed that the Legislature had made a policy decision to protect fetal life because it is "potential life," which necessarily anticipates a

---

*See footnote, *ante*, page 575.

live birth. Therefore, counsel argued, if medical evidence showed the fetus would not have survived to term, even absent defendants' criminal intervention, it was not potential life for purposes of a murder charge.

The court ruled that evidence of the medical condition of the fetus was irrelevant and inadmissible because viability is not an element of fetal homicide. (*People v. Davis* (1994) 7 Cal.4th 797, 814–815 [30 Cal.Rptr.2d 50, 872 P.2d 591]; Pen. Code, § 187, subd. (a), further section references are to the Penal Code unless otherwise specified.)

On appeal, defendants contend the trial court erred because fetal viability is not the same thing as "survivability," which defendant Valdez defines as meaning the fetus likely would have completed gestation and been born absent the criminal intervention of a third party. Relying on *Roe v. Wade* (1973) 410 U.S. 113 [35 L.Ed.2d 147, 93 S.Ct. 705] and subsequent abortion rights decisions, Valdez reiterates the position he took in the trial court that (1) the Legislature's purpose in protecting fetal life is the protection of "potential human life," and thus (2) if a fetus has no chance of developing until birth, it is not potential life and murder of such a fetus does not fall within the proscription of section 187, subdivision (a).

Valdez even goes so far as to claim that, "if interpreted to apply to the killing of a fetus which is mortally diseased, [the murder statute] violates the cruel and unusual punishment provisions of the state and federal constitutions."

It follows, defendants argue, the court erred in excluding evidence that, even absent defendants' criminal intervention, Mestas's fetus would not have survived until birth.

For reasons that follow, the contentions lack merit, and the proffered evidence was properly excluded.

A

██ After the California Supreme Court held that the former prohibition against the unlawful killing of a human being did not encompass the murder of a fetus (*Keeler v. Superior Court* (1970) 2 Cal.3d 619 [87 Cal.Rptr. 481, 470 P.2d 617]), the Legislature amended section 187, subdivision (a), to include the unlawful killing of a fetus. (Stats. 1970, ch. 1311, § 1, p. 2440.) The amended statute reads: "Murder is the unlawful killing of a human being, or a fetus, with malice aforethought." (§ 187, subd. (a).) It applies except when the death of the fetus resulted from a lawful abortion. (§ 187, subd. (b).)

■ The Legislature did not define "fetus" to be the equivalent of "human being," and it did not similarly amend section 192, which defines manslaughter as "the unlawful killing of a human being without malice." Consequently, a fetus is not a human being within the meaning of the murder statute. (*People v. Dennis* (1998) 17 Cal.4th 468, 505 [71 Cal.Rptr.2d 680, 950 P.2d 1035].) It is an unborn human offspring in the postembryonic period after major structures have been outlined, which typically occurs seven or eight weeks after fertilization. (*People v. Davis, supra,* 7 Cal.4th at pp. 810, 814–815.)[1]

Although a fetus is not a human being within the meaning of the murder statute, the Legislature made the policy decision that fetal life is entitled to the same protection as human life, except where the mother's paramount privacy interests are at stake. (*People v. Dennis, supra,* 17 Cal.4th at p. 511; *People v. Davis, supra,* 7 Cal.4th at pp. 803, 809–810.)

■ In making this policy decision, the Legislature was aware that it could have limited the term "fetus" to "viable fetus," but it did not do so. (*People v. Davis, supra,* 7 Cal.4th at p. 803.) Likewise, the Legislature did not require that, to be covered by the murder statute, the fetus must not be suffering from a fatal condition that would prevent it from developing until birth. Under the plain language of section 187, subdivision (a), fetuses with terminal conditions are nonetheless fetuses protected from an unlawful killing.

Defendants' reliance on *Roe v. Wade, supra,* 410 U.S. 113 [35 L.Ed.2d 147] and its progeny is misplaced because the legal principles in those decisions are inapplicable to a statute that criminalizes the unlawful killing of a fetus without the mother's consent. (*People v. Davis, supra,* 7 Cal.4th at p. 807.) Moreover, defendants point to nothing in those decisions to support a conclusion that the state's legitimate "interest in protecting *fetal life* or potential life" (*Planned Parenthood v. Casey* (1992) 505 U.S. 833, 876 [120 L.Ed.2d 674, 714, 112 S.Ct. 2791]; italics added) does not extend to fetuses with fatal conditions.

■ Despite statistical evidence disclosing that many fetuses spontaneously miscarry in the early stages of pregnancy (Comment, *Severe Penalties for the Destruction of 'Potential Life'—Cruel and Unusual Punishment?* (1995) 29 U.S.F. L.Rev. 463, 493–494), the Legislature did not limit the application of section 187, subdivision (a), to fetuses at stages of development that make them statistically more likely to survive until birth.

---

[1] Because the Legislature did not define "fetus" to be the equivalent of "human being," and did not similarly amend section 192, which defines manslaughter as "the unlawful killing of a human being without malice," there is no crime of manslaughter of a fetus. (*People v. Brown* (1995) 35 Cal.App.4th 1585, 1592–1594 [42 Cal.Rptr.2d 155]; accord, *People v. Dennis, supra,* 17 Cal.4th at pp. 505–506.)

■ Instead, as we have noted, the Legislature made the policy decision to protect fetal life in the same manner that it protects human life, except where the mother's paramount privacy interests are at stake. Section 187, subdivision (a), protects human beings who are suffering from fatal conditions and have little time to live. "Murder is never more than the shortening of life; if a defendant's culpable act has significantly decreased the span of a human life, the law will not hear him say that his victim would thereafter have died in any event." (*People v. Phillips* (1966) 64 Cal.2d 574, 579 [51 Cal.Rptr. 225, 414 P.2d 353], disapproved on another point in *People v. Flood* (1998) 18 Cal.4th 470, 490, fn. 12 [76 Cal.Rptr.2d 180, 957 P.2d 869]; *People v. Moan* (1884) 65 Cal. 532, 537 [4 P. 545].) It follows that the statute likewise must be construed to protect fetuses suffering from fatal conditions.

B

We reject defendants' claim that murder of a "non-survivable" fetus "is a much less serious offense" than murder of a human being and, thus, construing the murder statute to apply to such a fetus would violate constitutional prohibitions against cruel and unusual punishment.

■ Although not "cruel or unusual" in its method, a punishment may violate California's Constitution if "it is so disproportionate to the crime for which it is inflicted that it shocks the conscience and offends fundamental notions of human dignity." (*In re Lynch* (1972) 8 Cal.3d 410, 424 [105 Cal.Rptr. 217, 503 P.2d 921], fn. omitted.) Factors relevant to the assessment of such a claim include (1) the nature of the offense and the offender, (2) whether more serious crimes are punished in this state less severely than the offense in question, and (3) whether the same offense is punished more severely in this state than in other jurisdictions. (*Id.* at pp. 425–427.) Defendants focus on the second and third factors.[2]

As to the second factor, their argument is terse. They simply state: "In California, feticide has the same punishment as murder. But killing of a non-survivable feticide [*sic*] is not a comparable offense to murder: it is a much less serious offense, because the non-survivable fetus is not a potential human life."

■ This comparison to the penalty for murder of a human being in California is flawed because defendants underestimate the severity of the murder of a "non-survivable" fetus. As we have pointed out, the state has a

---

[2] In passing, defendants assert they did not know Mestas was pregnant when Valdez shot her and, in doing so, murdered her fetus; thus, their "punishment [for feticide] also fails the first prong of the *Lynch* test," i.e., an assessment of the nature of the offense and the offender. (*In re Lynch, supra,* 8 Cal.3d at p. 425.) We address this as-applied factor in part II, *post.*

legitimate interest in the protection of fetal life. (*Planned Parenthood v. Casey, supra,* 505 U.S. at p. 876 [120 L.Ed.2d at p. 714].) "The fact that the victim murdered is an unborn child does not render defendant less culpable, or the crime less severe, in light of the Legislature's determination that . . . fetuses receive the same protection under the murder statute as persons." (*People v. Bunyard* (1988) 45 Cal.3d 1189, 1240 [249 Cal.Rptr. 71, 756 P.2d 795].)

Receiving the same protection under the murder statute means that, just as the state may penalize an act that unlawfully shortens the existence of a terminally ill human being, it may penalize an act that unlawfully shortens the existence of a fetus which later would have perished before birth due to natural causes. (*People v. Phillips, supra,* 64 Cal.2d at p. 579; *People v. Moan, supra,* 65 Cal. at p. 537.)

Regarding the third factor, defendants' comparison of the punishment for feticide in California to punishments for feticide in other jurisdictions fails to provide any meaningful analysis of those other laws or to demonstrate that they would not apply under the facts of this case. They simply assert "California is unique in imposing murder penalties to the killing of a non-survivable fetus" and, thus, it is excessively harsh to permit a conviction for murdering such a fetus.

This assertion is undermined by our state Supreme Court's observation in *People v. Davis, supra,* 7 Cal.4th 797, that murder statutes in Arizona, Illinois, Louisiana, Minnesota, North Dakota, and Utah, criminalizing the nonconsensual killing of an "unborn child" do not require the unborn to have reached a particular stage of development. (*Id.* at p. 808.) Therefore, California is not as unique as defendants claim.

Moreover, the fact that "California's punishment scheme is among the most extreme does not compel the conclusion that it is unconstitutionally cruel or unusual. This state constitutional consideration does not require California to march in lockstep with other states in fashioning a penal code." (*People v. Martinez* (1999) 71 Cal.App.4th 1502, 1516 [84 Cal.Rptr.2d 638].) "[T]he needs and concerns of a particular state may induce it to treat certain crimes . . . more severely than any other state. . . . [¶] Whether a particular punishment is disproportionate to the offense is a question of degree. The choice of fitting and proper penalty is not an exact science but a legislative skill involving an appraisal of the evils to be corrected, the weighing of practical alternatives, consideration of relevant policy factors, and responsiveness to the public will. . . . Thus, the judiciary should not interfere in the

process unless a statute prescribes a penalty ' "out of all proportion to the offense." ' [Citation.]" (*People v. Cooper* (1996) 43 Cal.App.4th 815, 827 [51 Cal.Rptr.2d 106]; see also *Harmelin v. Michigan* (1991) 501 U.S. 957, 985–986, 993–994 [115 L.Ed.2d 836, 858–859, 864, 111 S.Ct. 2680] (plur. opn. of Scalia, J.); *id.* at p. 1004 [115 L.Ed.2d at p. 871] (conc. opn. of Kennedy, J.) [the Eighth Amendment forbids only extreme sentences that are grossly disproportionate to the crime].)

As we have noted, our state's Legislature made a policy decision to protect fetal life in the same manner as the life of a human being, except where the mother's paramount privacy interests are at stake. In light of the state's legitimate interest in protecting fetal life, we cannot say that it is grossly disproportionate, or that it shocks the conscience or offends fundamental notions of human dignity, to punish as murder the unlawful killing of a fetus which, due to a physical or medical condition, may not otherwise survive until birth. In other words, construing California's murder statute to apply to the killing of "a non-survivable fetus" does not violate the cruel and/or unusual punishment clauses of the state and federal Constitutions.

## C

In any event, defendants did not offer any evidence showing there was no possibility that medical intervention could have prevented the fetus from perishing as a result of the inflammation. Hence, they failed to establish the factual predicate for their legal claim.

## II–XIV*

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

## DISPOSITION

The judgments imposed on September 18, 2000, are modified as follows: (1) the section 186.22, subdivision (b)(1) sentence enhancements on the murders and attempted murder convictions (counts I, II, and IV) are stricken and 15-year minimum parole eligibility terms are imposed instead (§ 186.22, subd. (b)(5)); (2) the stay of the section 12022.53, subdivision (d) enhancement on the fetal murder conviction (count II) is vacated; and (3) the award of 123 days of presentence conduct credits is stricken. As modified, the judgments are affirmed.

---

*See footnote, *ante*, page 575.

The trial court is directed to amend the abstract of judgments to reflect these modifications, and to forward certified copies of the amended abstracts to the Department of Corrections.

Davis, J., and Raye, J., concurred.

The petitions of all appellants for review by the Supreme Court were denied May 11, 2005. Kennard, J., was of the opinion that the petitions should be granted.