[Crim. No. 2827. Fifth Dist. Jan. 3, 1978.]

THE PEOPLE, Plaintiff and Respondent, v.
LARRY APODACA, Defendant and Appellant.

**482**

## Counsel

Paul Halvonik, State Public Defender, under appointment by the Court of Appeal, and Gary S. Goodpaster, Chief Assistant State Public Defender, for Defendant and Appellant.

Evelle J. Younger, Attorney General, Jack R. Winkler, Chief Assistant Attorney General, Arnold O. Overoye, Assistant Attorney General, Eddie T. Keller and Joel Carey, Deputy Attorneys General, for Plaintiff and Respondent.

## Opinion

**GARGANO, J.**—After a jury trial in the Superior Court of Fresno County, appellant Larry Apodaca was convicted of the murder of a human fetus (Pen. Code, § 187);[1] the jury determined that the murder was of the second degree (§ 189). He also was convicted by the jury of rape by threats of great and immediate bodily harm (§ 261, subd. 3), and of assault by means of force likely to produce great bodily injury (§ 245, subd. (a)). Appellant's request for probation was denied, and he was sentenced to state prison on all three convictions for the terms prescribed by law; the sentences were ordered to be served concurrently.

---

[1] Hereafter, unless otherwise indicated, all statutory references are to sections of the Penal Code.

Appellant's appeal primarily centers upon section 187. Under that section, murder is defined as ". . . the unlawful killing of a human being, or a fetus, with malice aforethought," and appellant claims that insofar as the definition applies to the murder of an unborn child it is impermissibly vague. His appeal also raises these points: that the trial court erred in instructing the jury that a "fetus" within the ambit of section 187 is an unborn human infant growing in the uterus of the mother from the end of the third month of pregnancy until birth; that the court committed prejudicial error in refusing to instruct the jury that manslaughter of a human fetus was a lesser and included offense of murder of a human fetus; and that the execution of state prison sentences on the three convictions constituted impermissible multiple punishment under section 654.

Appellant is the former husband of Caroline Apodaca; the couple's marriage was dissolved on August 15, 1974. Thereafter, appellant and Caroline ceased living together, although it was not uncommon for appellant occasionally to spend the night with his former wife at her apartment in the City of Fresno.

On September 27, 1975, at about 6 a.m., appellant unexpectedly appeared at his former wife's apartment and knocked on the front door; when no one responded to his knock, appellant used a key to unlock the front door and entered the apartment. At the time, Caroline, who was 22 to 24 weeks pregnant, was asleep in her bed with her 4-year-old son, Danny; in a second bedroom was her 3-year-old son, Jason.

Appellant had been drinking and, as he walked down the hallway toward his former wife's bedroom, he leaned up against the wall. In the meanwhile, the woman had been awakened by the sound of appellant unlocking the front door; knowing that her ex-husband was the only person other than herself who had a key to the apartment, she remained in bed.

In the bedroom, appellant approached Caroline's bed and sat down beside her; he lifted the blouse she was wearing, placed his hand on her stomach and disclaimed responsibility for the woman's pregnancy. Then appellant got up, went into the kitchen and opened the refrigerator; he returned to the bedroom and carried Danny to a bed in another bedroom; when he returned to Caroline's bedroom, he commenced to remove his clothes. Caroline told appellant that she was sick, but appellant undressed and got into bed anyway.

Once on the bed, appellant got on his knees and straddled his former wife; he again disclaimed responsibility for the pregnancy. He inquired as to the identity of the father and said that the woman was not going to have anybody else's baby; he struck her several times in the stomach; he also placed his thumbs in Caroline's eyes and pressed down hard. Caroline pulled appellant's hair and asked him not to hit her because of the baby. At that point, appellant grabbed Caroline around the throat and began to choke her.

After appellant stopped choking Caroline, he pulled her off of the bed and dragged her over to a spot on the floor between two closet doors; he went to a nearby dresser and removed a couple of nylon stockings and a scarf. Appellant returned to Caroline who was on the floor on her back; he tied her wrists together with one of the stockings, and then tied the end of the stocking to the doorknob on one of the closet doors. He also tied Caroline's ankles together with the other nylon stocking and fastened the end of that stocking to the doorknob on the other closet door.

Appellant then got on top of the woman and stuffed part of the scarf into her mouth; he again hit her in the stomach several times, while stating that she was not going to have anybody else's baby and that he was going to kill it. Appellant next forcibly engaged in an act of sexual intercourse with Caroline.

Upon completing the sexual act, appellant went to the closet, got a dirty towel from the laundry basket and used it to wipe between Caroline's legs. He showed the towel, which was red with blood, to his former wife and said, "I've done it. I've killed it." Appellant untied the pregnant woman and helped her up from the floor; as he did so, appellant placed one of his hands over her stomach and repeated, "I've done it. I've killed it."

A few moments later, appellant took Caroline's hand and placed it on her stomach; she discovered that her stomach was flat, "as if the baby had lowered himself." Appellant pulled Caroline onto the bed and lay down beside her; when appellant fell asleep the woman got up, put on a dress and telephoned the police.

After the police arrived, appellant was placed under arrest and taken to jail. Caroline was taken to the Fresno Community Hospital where she was examined by a doctor; he detected a fetal heartrate of 140 beats a

minute. Within a couple of hours, Caroline was transported to the Valley Medical Center in Fresno, and was checked by another doctor; the doctor could not detect a fetal heartbeat.

On October 7, 1975, Caroline gave birth to a dead fetus; an autopsy indicated that the fetus had died about 10 days earlier and that death was due to a partial separation of the placenta from the cervix of the uterus, which cut off the fetus' supply of oxygen and nutrients from the mother; such a separation can result from a "physical trauma" inflicted on the mother.

At trial appellant's only defense was diminished capacity. He presented evidence to prove that on the night of the assault he was extremely intoxicated from the ingestion of alcoholic beverages and pills and from the smoking of marijuana. Appellant testified that he was unable to remember most of the significant events that occurred after he entered his former wife's apartment. In addition, a psychiatrist testified that appellant had structural brain damage and emotional conflicts. The doctor was of the opinion that appellant had a diminished capacity on the night of the attack, and that the diminished capacity "compromised" his ability to form malice aforethought.

Appellant's first contention that section 187 is impermissibly vague insofar as it purports to define a crime of murder of an unborn child is grounded upon the proposition that persons of common intelligence cannot reasonably understand the conduct proscribed.[2] He argues that his conviction for murdering the unborn infant violated his right to due process of law because section 187 merely used the term "fetus" and did not notify him as to exactly what stage of development of unborn human life it was intended to cover. For instance, according to one medical dictionary, an embryo becomes a fetus between seven to eight weeks after fertilization. (Dorland's Illus. Medical Dict. (25th ed. 1974) p. 579.) Another medical dictionary suggests than an embryo does not become a fetus until at least three months after conception. (Taber's Cyclopedic Medical Dict. (11th ed. 1970) p. F-14.) Still another work says that, medically, a fetus is not considered more than an embryo until

---

[2]Section 187 defines the murder of an unborn child as the unlawful killing of a "fetus" with malice aforethought except where the act resulting in the death of the fetus (1) was done in compliance with the Therapeutic Abortion Act contained in chapter 11 of division 20 of the Health and Safety Code, (2) was done by a licensed physician or surgeon within the meaning of the Business and Professions Code, where the result of childbirth otherwise would have been the death of the mother of the fetus, or (3) was solicited, aided, abetted or consented to by the mother of the fetus.

20 weeks of development have taken place. (5B Lawyer's Medical Cyclopedia (rev. ed. 1972) § 37.2b, pp. 10-11.)

■ It is fundamental that all citizens of a free state must be informed as to what the state commands or forbids, and that no one should be required at peril of life, liberty or property to speculate as to the meaning of the state's penal statutes (*Lanzetta* v. *New Jersey* (1939) 306 U.S. 451, 453 [83 L.Ed. 888, 890, 59 S.Ct. 618, 619]; *Findley* v. *Justice Court* (1976) 62 Cal.App.3d 566, 570 [133 Cal.Rptr. 241]); fairness alone requires that no man be held criminally responsible for conduct he could not reasonably understand to be proscribed (*United States* v. *Harriss* (1954) 347 U.S. 612, 617 [98 L.Ed. 989, 996, 74 S.Ct. 808, 812]). Accordingly, a statute which either forbids or requires the doing of an act in terms so vague that persons of common intelligence must guess at its meaning and could differ as to its application, does not give fair notice as to the forbidden conduct and lacks an essential ingredient of due process of law. (*Connally* v. *General Construction Co.* (1926) 269 U.S. 385, 391 [70 L.Ed. 322, 328, 46 S.Ct. 126, 127]; *People* v. *McCaughan* (1957) 49 Cal.2d 409, 414 [317 P.2d 974].)

■ We do not agree with appellant's position that the California statute defining murder of an unborn child contravenes the constitutional principles we have delineated. Section 187 gives all persons of common intelligence ample warning that an assault on a pregnant woman without her consent for the purpose of unlawfully killing her unborn child can constitute the crime of murder. Consequently, appellant was fully and adequately warned that the brutal attack he committed upon his former wife for the avowed purpose of killing her unborn baby could result in a charge of murder of a fetus. Due process does not require more. As the United States Supreme Court said in *Boyce Motor Lines* v. *United States* (1952) 342 U.S. 337, 340 [96 L.Ed. 367, 371, 72 S.Ct. 329, 331], in writing criminal statutes, ". . . no more than a reasonable degree of certainty can be demanded. Nor is it unfair to require that one who deliberately goes perilously close to an area of proscribed conduct shall take the risk that he may cross the line." (See also *Rose* v. *Locke* (1975) 423 U.S. 48, 49-50 [46 L.Ed.2d 185, 187-188, 96 S.Ct. 243, 244].)

■ Next, appellant complains because the court instructed the jury that a "fetus" within the meaning of section 187 is ". . . an unborn human infant growing in the uterus [of the mother] from the end of the third month of pregnancy until birth." He insists that under the Fourteenth Amendment of the United States Constitution the state's power to charge and convict a person of murdering an unborn child is

limited to a fetus that is viable at the time of the killing; a fetus is viable when it has reached that stage of fetal development at which the unborn human infant is capable of surviving the trauma of birth and living outside of the mother's womb, albeit with artificial medical aid. (See *Planned Parenthood of Missouri* v. *Danforth* (1976) 428 U.S. 52, 63-64 [49 L.Ed.2d 788, 801-802, 96 S.Ct. 2831, 2838]; *Roe* v. *Wade* (1973) 410 U.S. 113, 160 [35 L.Ed.2d 147, 181, 93 S.Ct. 705, 730]; *People* v. *Smith* (1976) 59 Cal.App.3d 751, 758 [129 Cal.Rptr. 498].) Appellant apparently concludes that if section 187 is not impermissibly vague, then the crime of murder of a fetus must be limited to a viable fetus in order to meet constitutional standards. (See *People* v. *Smith, supra,* 59 Cal.App.3d 751, 756-759.)

We do not find it necessary to reach this constitutional question. In the case at bench, it was undisputed that the fetus was between 22 and 24 weeks old when the attack occurred, and the uncontradicted medical testimony was that it was viable at the time it was slain. Under those circumstances, any error in the court's failure to define the word "fetus" in terms of viability, as appellant requested the court to do, was not prejudicial. There is no evidence in the record which contradicts the People's medical testimony that the fetus was viable, and the failure to instruct on an essential element of the offense actually charged is not prejudicial where the People's evidence conclusively establishes the existence of that element and there is absolutely no evidence deserving of any consideration whatsoever from which a jury could have found in favor of the defendant on that specific point. (*People* v. *Thornton* (1974) 11 Cal.3d 738, 769, fn. 20 [114 Cal.Rptr. 467, 523 P.2d 267] (maj. opn.) and pp. 771-775 (conc. and dis. opn., Mosk, J.); see *People* v. *Morse* (1969) 70 Cal.2d 711, 736 [76 Cal.Rptr. 391, 452 P.2d 607]; *People* v. *Saterfield* (1967) 65 Cal.2d 752, 760 [56 Cal.Rptr. 338, 423 P.2d 266].)

In response, appellant vigorously argues that he was precluded from presenting evidence on the issue of the fetus' viability by the "law of the case." Initially, appellant raised the issue of defining the word "fetus" in terms of viability at a pretrial motion which was denied by Judge Leonard Meyers. Later, at the trial, the trial judge (Judge Simon Marootian) indicated a belief that the fetus' viability was not in issue. Therefore, appellant insists that he is not barred or precluded from raising the instructional error on appeal even though there is no evidence of nonviability in the record.

We are not impressed by appellant's argument. There is nothing in the record remotely to suggest that appellant had any medical evidence to

prove that the fetus was not viable at the time of the brutal attack; appellant not only failed to make an offer of proof in this respect, but he never even gave the court any indication that he had any such evidence and wished to present it. On the other hand, Dr. Thomas Nelson, the pathologist called by the People, gave a scholarly and knowledgeable discussion on the subject of fetus viability and then emphatically expressed the opinion that the fetus was viable when it was slain; the doctor substantiated his opinion with well-accepted medical reasons, including body measurements. To reverse the judgment we would have to speculate that appellant could have presented credible medical evidence that the fetus was not viable at the time of the attack. While a defendant has a constitutional right to have a jury determine every material issue *presented by the evidence* (*People* v. *Sedeno* (1974) 10 Cal.3d 703, 720 [112 Cal.Rptr. 1, 518 P.2d 913]; *People* v. *Modesto* (1963) 59 Cal.2d 722, 733 [31 Cal.Rptr. 225, 382 P.2d 33]), in the present case there is no evidence in the record contradicting the People's medical testimony that the fetus was viable. It is fundamental that the denial of a constitutional right resulting in essential unfairness must be established as a demonstrable reality, not as a matter of speculation. (*Darcy* v. *Handy* (1956) 351 U.S. 454, 462 [100 L.Ed. 1331, 1337-1338, 76 S.Ct. 965, 970]; *People* v. *Perez* (1973) 9 Cal.3d 651, 660-661 [108 Cal.Rptr. 474, 510 P.2d 1026].)

Appellant's reliance on the doctrine of the "law of the case" to support his position that he was precluded from presenting any evidence on the fetus' viability is misplaced. ■ Initially, the doctrine of the "law of the case" applies only to a decision of an appellate court in the same case; it has no application whatever to rulings made at the trial court level. (See *People* v. *Shuey* (1975) 13 Cal.3d 835, 841-842 [120 Cal.Rptr. 83, 533 P.2d 211]; *People* v. *Medina* (1972) 6 Cal.3d 484, 491, fn. 7 [99 Cal.Rptr. 630, 492 P.2d 686]; 6 Witkin, Cal. Procedure (2d ed. 1971) Appeal, § 634, p. 4553.) **(3b)** Secondly, Judge Meyers' ruling on appellant's pretrial motion was not binding on Judge Marootian, the judge who conducted the trial. (See Code Civ. Proc., § 128, subd. 8; *People* v. *Beasley* (1967) 250 Cal.App.2d 71, 77 [58 Cal.Rptr. 485].) Furthermore, albeit the trial judge may have indicated that he believed that viability was not a pertinent issue, appellant's trial counsel must have believed that neither he nor the trial judge was bound by the pretrial ruling since he requested a jury instruction defining the word "fetus" in terms of viability. Yet defense counsel never pressed the trial judge for a new ruling; he merely requested the jury instruction on viability and never produced any evidence contradicting the People's

medical testimony that the fetus was viable. As the record now stands, we simply have no way of knowing what, if any, evidence appellant could have presented, or how the trial judge might have ruled had he been confronted with a direct request for a ruling coupled with an offer of proof.[3]

To recapitulate, the record in this case leads inescapably to the conclusion that the fetus was viable when appellant viciously attacked his former wife. The record also leads to the conclusion that appellant's trial counsel must have believed that viability was an issue in the case because, despite the ruling on his pretrial motion, he requested the trial judge to define for the jury the word "fetus" in terms of viability and did not raise a relevancy objection to the People's evidence of viability. Nevertheless, defense counsel made no attempt to present any medical evidence on that critical issue or press the trial court for a ruling with reference to the admissibility of such evidence if he had any to present. Accordingly, appellant asks this court, contrary to appellate practice, to reverse his conviction on the bare chance that he may be able to present credible evidence to contradict the well-shored medical opinion of the pathologist, Dr. Thomas Nelson.

Next, appellant maintains that, in any event, there was evidence that the fetus was not viable when it was killed, and that the court's failure to instruct in terms of viability was prejudicial for this reason. There was testimony that the fetus in question was between 22 and 24 weeks old when the attack took place and appellant draws on *Roe* v. *Wade, supra,* 410 U.S. 113, 160 [35 L.Ed.2d 147, 181, 93 S.Ct. 705, 730], for the viewpoint that as a matter of constitutional law, viability of a fetus does not occur until it is at least 24 weeks old.

■ Appellant's argument on this point is specious. A fetus is viable when it has achieved the capability for independent existence; as we have indicated, a fetus is deemed viable when it is possible for it to survive the trauma of birth, although with artificial medical aid. It

---

[3]If appellant can show that his trial counsel had, or could have had, medical evidence on the viability issue to present and that he deprived appellant of a vital defense by his failure to do so or to make an offer of proof, appellant should raise the issue by appropriate writ. (See *In re Saunders* (1970) 2 Cal.3d 1033, 1041-1044 [88 Cal.Rptr. 633, 472 P.2d 921].) Appellate counsel could have filed such a writ in this court and had it consolidated with this appeal (see e.g. *People* v. *Westmoreland* (1976) 58 Cal.App.3d 32, 36 [129 Cal.Rptr. 554]; *In re Miller* (1973) 33 Cal.App.3d 1005, 1008-1009 [109 Cal.Rptr. 648]) but apparently chose not to do so, thus leaving everything to speculation with regard to the availability of evidence of nonviability.

follows that whether a fetus is viable at a given time is a question of fact that is dependent upon the peculiar circumstances of each case. Moreover, the court in *Roe* v. *Wade, supra,* 410 U.S. 113, 160 [35 L.Ed.2d 147, 181, 93 S.Ct. 705, 730] accepted the medical definition of viability (i.e., "potentially able to live outside the mother's womb, albeit with artificial aid"), and merely observed that, generally, viability of a human fetus occurs when it is between 24 and 28 weeks old; the court did not foreclose medical evidence to the contrary or limit the definition of viability to a specific gestational time period. (See *Planned Parenthood of Missouri* v. *Danforth, supra,* 428 U.S. 52, 63-64 [49 L.Ed.2d 788, 801-802, 96 S.Ct. 2831, 2838]; *People* v. *Smith, supra,* 59 Cal.App.3d 751, 758-759.) The evidence in the present case was uncontradicted that the fetus was viable in the sense it was capable of surviving the trauma of birth.[4]

■ We turn to appellant's third contention that the court erred in refusing to instruct the jury on manslaughter. Appellant concedes that section 192 defines manslaughter merely as ". . . the unlawful killing of a *human being* with malice" (italics added), and that it has been held that the term "human being" within the ambit of the California homicide law means only a person who has been born alive and does not include within its meaning any type of unborn children. (*Keeler* v. *Superior Court* (1970) 2 Cal.3d 619, 624-631 [87 Cal.Rptr. 481, 470 P.2d 617, 40 A.L.R.3d 420]; *People* v. *Carlson* (1974) 37 Cal.App.3d 349, 355 [112 Cal.Rptr. 321].) He argues that, pursuant to his constitutional right to a fair trial and under the equal protection and due process clauses of the United States Constitution, the crime of manslaughter must be declared a lesser and included offense of the murder of a fetus because if there is no crime of manslaughter of a fetus, a defendant accused of murdering a fetus, unlike a defendant accused of murder of a person who was born alive, is ". . . unable to have his actual mental state at the time of the [crime] properly and fully assessed by the jury." Appellant suggests that in a case

_____

[4]Appellant also claims that there was a question of fact as to the viability of the fetus since the jury was free to disregard the uncontradicted opinion of Dr. Nelson and draw its own conclusions from the facts. We do not agree. The uncontradicted and unimpeached opinion testimony of an expert may not be arbitrarily disregarded. (*Krause* v. *Apodaca* (not the appellant in the present case) (1960) 186 Cal.App.2d 413, 417 [9 Cal.Rptr. 10]; *Wirz* v. *Wirz* (1950) 96 Cal.App.2d 171, 176 [214 P.2d 839, 15 A.L.R.2d 1129]; see. Witkin, Cal. Evidence (2d ed. 1966) § 431, p. 388.) As explained by the California Supreme Court in *Mantonya* v. *Bratlie* (1948) 33 Cal.2d 120, 127 [199 P.2d 677], ". . . the trier of fact is not entitled, arbitrarily or upon mere caprice, to disregard uncontradicted, entirely probable testimony of unimpeached witnesses." Dr. Nelson's opinion that the fetus was viable must be accepted as true for it was not inherently improbable, impeached or contradicted by other testimony or by an inference deducible from the facts proved. (See Witkin, Cal. Evidence (2d ed. 1966) § 1110, p. 1026.)

involving an attack on a pregnant woman the jury will inevitably convict the defendant of murder if the fetus dies as the result of the attack even though there is strong evidence of a diminished capacity that negates malice, because there is no lesser and included offense, such as manslaughter, to fasten upon. In short, he objects to the all-or-nothing approach taken by the California homicide law on the subject of unlawful killings of unborn children.

We reject appellant's contention that the court should have instructed on manslaughter for two basic reasons. First, the California law on the murder of a human fetus finds its genesis in Assembly Bill No. 816 of the 1970 Regular Session of the California Legislature, and the legislative history of this bill clearly indicates that the omission of the word "fetus" from section 192 (the manslaughter statute) was not due to legislative oversight; it was the exercise of legislative judgment. (See Comment, *Is The Intentional Killing Of An Unborn Child Homicide?* (1971) 2 Pacific L.J. 170, 172-175, 181.) Accordingly, in this state there is no statutory crime of manslaughter of a fetus. (*People* v. *Carlson, supra,* 37 Cal.App.3d 349, 355), and we cannot create a "nonstatutory crime" by judicial fiat (Pen. Code, § 6; *In re Brown* (1973) 9 Cal.3d 612, 624 [108 Cal.Rptr. 465, 510 P.2d 1017]; *Keeler* v. *Superior Court, supra,* 2 Cal.3d 619, 631-632; *People* v. *Mosher* (1969) 1 Cal.3d 379, 385, fn. 1 [82 Cal.Rptr. 379, 461 P.2d 659]), not even to satisfy a constitutional mandate. Thus, if it were unconstitutional for the California Legislature to have created the crime of murder of a fetus without at the same time creating the lesser and included offense of manslaughter of a fetus, we could not judicially create the lesser and included offense but would have to declare the statutory law on murder of a fetus unconstitutional.

Second, under section 187, if a killing of a fetus is committed with malice aforethought, the crime is murder, either in the first or second degree. However, if, because of a diminished mental capacity, there was no malice aforethought (absent a permissible application of the felony-murder rule), the killing of a fetus is neither murder nor any other criminal homicide. It is patent that under proper instructions to the jury, a person accused of murdering a fetus can have his actual mental state on the issue of malice fully assessed, even though manslaughter of a fetus is not a lesser and included offense of that statutory crime.[5] It is also

---

[5]For example, in this case the court told the jury: "[I]f you find that the defendant's mental capacity was diminished to the extent that you have a reasonable doubt whether he was able to form the mental states constituting either express or implied malice aforethought, you cannot find him guilty of murder of either the first or second degree."

patent that the foundation for appellant's belief that jurors will ignore the court's instructions and inevitably convict a person accused of a murder of a fetus because there is no lesser and included offense of manslaughter to fasten onto is grounded upon nothing more than conjecture; he has presented no statistics or other demonstrable evidence to support the thesis that juries do not follow the court's instructions on the law, but establish their own ad hoc standards of culpability. It must be presumed that the jurors observed and applied the instructions given them. (*People* v. *Chavez* (1958) 50 Cal.2d 778, 790 [329 P.2d 907]; *People* v. *Sutic* (1953) 41 Cal.2d 483, 494 [261 P.2d 241]; *People* v. *Valerio* (1970) 13 Cal.App.3d 912, 925 [92 Cal.Rptr. 82].) Appellant having failed to present any applicable empirical data refuting the validity of such a presumption, asks us to speculate that he is being denied his constitutional right to a fair trial, and other similar constitutional rights, because of the absence of a crime of manslaughter of a fetus. As we stated earlier, the denial of a constitutional right resulting in essential unfairness must be established as a demonstrable reality, not as a matter of speculation. (*Darcy* v. *Handy, supra,* 351 U.S. 454, 462 [100 L.Ed. 1331, 1337-1338, 76 S.Ct. 965, 970]; *People* v. *Perez, supra,* 9 Cal.3d 651, 660-661.)[6]

■ Appellant's remaining argument is that the trial court imposed impermissible multiple punishment in violation of section 654. The court sentenced appellant to state prison on the murder of the fetus (count I), on the rape of Caroline Apodaca (count II) and on the assault upon Caroline Apodaca by means of force likely to produce great bodily injury (count III); the court further ordered that all three sentences be served concurrently.

With regard to the rape and the assault, we agree with appellant that there has been an infliction of impermissible multiple punishment. When appellant initially entered his former wife's bedroom, he showed great interest in her pregnancy; he lifted up her blouse, placed his hand on her stomach and denied responsibility for her pregnancy. After taking the young child sleeping with his former wife to another room, appellant removed his clothes, got on the bed, straddled the woman and again denied responsibility for the woman's pregnancy; he stated that Caroline

---

[6]We also disagree with appellant's contention that the California homicide law on the killing of fetuses creates a conclusive and irrebuttable presumption that the killing of a fetus, which is neither accidental nor the result of a legitimate abortion is murder. It should be clear from what we have said that where one accused of unlawfully killing a fetus commits acts which merely would constitute manslaughter if the victim were a human being that was born alive, the accused cannot be guilty of a criminal homicide.

was not going to have anyone else's baby and commenced to hit Caroline in the stomach with his fists. He then pulled his former wife off the bed, tied the woman up, commenced to hit her in the stomach again, and repeated that she was not going to have anyone else's baby. Next, without his former wife's consent, appellant forcibly engaged in an act of sexual intercourse; immediately thereafter he obtained a towel from the closet and used it to wipe between Caroline's legs. He then showed the towel, which was red with blood, to Caroline and exclaimed, "I've done it. I've killed it."

In sum, the evidence indisputably leads to the conclusion that appellant's assault upon his former wife with his fists and his act of sexual intercourse were nothing but violent acts committed upon Caroline pursuant to a single intent and objective, that is, to kill the fetus inside the woman. Since the assault and the rape were part of an indivisible course of conduct and were merely incidental to each other and a means toward the principal criminal objective of killing the fetus, it was error for the trial court to punish appellant for both the assault and the rape. (See *People* v. *Miller* (1977) 18 Cal.3d 873, 885 [135 Cal.Rptr. 654, 558 P.2d 552]; *People* v. *Beamon* (1973) 8 Cal.3d 625, 639 [105 Cal.Rptr. 681, 504 P.2d 905]; *People* v. *Bauer* (1969) 1 Cal.3d 368, 376 [82 Cal.Rptr. 357, 461 P.2d 637, 37 A.L.R.3d 1398].) Further, since a rape conviction carries a greater state prison sentence than a conviction for assault by means of force likely to produce great bodily injury, we shall stay the execution of the sentence on the assault conviction. (See *People* v. *Beamon, supra,* 8 Cal.3d 625, 640; *People* v. *Niles* (1964) 227 Cal.App.2d 749, 755-756 [39 Cal.Rptr. 11].)

■ However, it is not impermissible multiple punishment to have appellant serving sentences on both the murder of the fetus and the rape, for each was a crime of violence against a different victim; the murder was a crime against the fetus, while the rape was a crime against Caroline Apodaca. (See *People* v. *Miller, supra,* 18 Cal.3d 873, 885; *Neal* v. *State of California* (1960) 55 Cal.2d 11, 20-21 [9 Cal.Rptr. 607, 357 P.2d 839].)

In accordance with the foregoing determination, the judgment entered herein is modified by adding immediately after the trial court's order sentencing defendant to state prison for the term provided by law, the following: "Provided, however, that the execution of the sentence for the assault by means of force likely to produce great bodily injury (count III) be stayed pending the finality of this judgment and the service of

sentence as to the rape conviction (count II), such stay to become permanent when service of sentence as to count II is completed."

As so modified, the judgment is affirmed.

The trial court hereby is directed to prepare an amended abstract of judgment reflecting the above modification and to deliver a copy of the amended abstract of judgment to the Department of Corrections.

The Department of Corrections hereby is directed to amend appellant's commitment record to conform with this opinion, and to reflect the new commitment.

Brown (G. A.), P. J., and Franson, J., concurred.

On February 2, 1978, the opinion was modified to read as printed above. Appellant's petition for a hearing by the Supreme Court was denied March 2, 1978.