127 Cal.Rptr.2d 443 (2002)
103 Cal.App.4th 1275
The PEOPLE, Plaintiff and Respondent,
v.
Harold Wayne TAYLOR, Defendant and Appellant.
No. A095412.
Court of Appeal, First District, Division Four.
November 27, 2002.
Review Granted February 19, 2003.
*444 Joseph Shipp, Sebastapol, for appellant.
Bill Lockyer, Attorney General, Robert R. Anderson, Chief Assistant Attorney General, Ronald A. Bass, Senior Assistant Attorney General, Eric D. Share, Supervising Deputy Attorney General, Catherine A. McBrien, Deputy Attorney General, for respondent.
Certified for Partial Publication.[*]
REARDON, J.
Harold Wayne Taylor (appellant) killed Patty Fansler and the 11-to-13 week-old fetus she was carrying. He did not know Ms. Fansler was pregnant, nor was her pregnancy apparent. Do these facts support an inference of implied malice sufficient to sustain a second degree fetal murder conviction? They do not, and accordingly we reverse that conviction for insufficient evidence but affirm the conviction *445 of second degree murder of Ms. Fansler.

I. FACTS

A. The Relationship, Breakup and Deteriorating Situation

Appellant met Ms. Fansler in the spring of 1997. They dated and then lived together in Calpella, along with Ms. Fansler's three children. They separated in July 1998; Ms. Fansler moved out. Christy Trotter, Ms. Fansler's niece, helped her move. Trotter heard appellant threaten to kill Ms. Fansler and anyone close to her if she left him. According to Betty Sanchez, Ms. Fansler's life-long friend, appellant wanted to "get back" with Ms. Fansler. He told Sanchez he could not handle the breakup, everything reminded him of her, and if he could not have her, "nobody else could."
The two spent New Year's Eve together. On January 1, 1999,[1] Lakeport Police Department Sergeant Brad Rasmussen responded to a call about a woman screaming at the Skylark Motel. Sergeant Rasmussen went to the room. Appellant opened the door. Ms. Fansler was there, in boxer shorts and a T-shirt. She was "upset and crying." Ms. Fansler said appellant raped her; Rasmussen arrested him.
In the course of the rape investigation, Ms. Fansler asked Investigator Craig Woodworth of the Lake County District Attorney's Office to register a restraining order with the Mendocino County Sheriffs Department.[2] The order was signed on January 5, and appellant was served on February 1. He did not consent to the restraining order, the stay-away order, the counseling order or the firearms restriction.
After the first of the year Ms. Fansler asked Randall Lee, manager of the Wal-Mart where she worked as an overnight stocker, to alter her shifts. She did not want appellant to know when she was working. Shortly before she was murdered, Ms. Fansler asked Lee for a transfer to the State of Washington because she was afraid of appellant.
Around the 5th or 6th of January, Richard Fansler, Ms. Fansler's ex-husband, drove Ms. Fansler to work.[3] Appellant followed them at high speeds for a mile or so.
Appellant tailgated Ms. Fansler again on two occasions on January 20. On the first occasion, when she sped up to around 75 miles per hour, he accelerated "onto her rear" and continued tailgating. Later that day he tailgated her again. At that point Ms. Fansler went to the Mendocino County Sheriffs Office, "upset and crying." She told Deputy Fletcher about the incidents, indicating appellant was "swerving behind her." She "was scared of him."

B. Circumstances Leading up to the Offenses

Beginning in January, Tamara Baxman, appellant's ex-wife and mother of his three children, noticed a change in him. He was agitated and bought an unusual number of presents for the children. He told them he would be going away for a long time and would not be seeing them. Around this time appellant gave his daughter a box *446 containing all his army records and medals.
Jack Wilder was a close friend of appellant. In March appellant was living next door with Wilder's son, Brian. Appellant was "pretty mad" about the rape accusation and said he wanted to kill Ms. Fansler. Appellant also talked to Brian about confronting Ms. Fansler and "having her resign his van to him" or getting "stuff she owed him. He told Brian he wanted to "knock her around a little bit and try to get her to see things his way."
Wilder owned a .22-caliber semiautomatic pistol and had given Brian a nine-millimeter handgun. Jack loaned the nine-millimeter to appellant. The "boys" had seen appellant with the .22, but Wilder "wasn't really concerned." Shortly before the murder, appellant talked to Wilder about throwing a gun over a cliff. Wilder also observed appellant make a silencer for a .22 and test it, many times, in the presence of company. The last time appellant test-fired a .22 with a silencer occurred after the rape allegation. Appellant was "firing it everywhere to try to perfect it." Appellant told Brian that if he wanted to kill someone he would use a .22 because of the low noise and the bullet would not exit the skull, thus causing more damage.
In February appellant began asking Brian to accompany him to Ukiah for the purpose of getting Ms. Fansler to open her door. Brian wanted "no part of it." Appellant also asked Brian's cousin, Jeremy Lugger, to knock on the door because Ms. Fansler did not know Lugger. Appellant "made it sound" like Ms. Fansler was withholding some of his property. The weekend before the murder, appellant drew a schematic of Ms. Fansler's apartment building for Lugger. He wanted Lugger to pull the phone lines as he went through the door. Appellant said Lugger would "carry" the .22 and gave him the .22. Lugger looked at it, but took it all as "crazy talk." When Lugger last saw appellant, appellant said he would compensate them "once it was all done." Appellant also asked Brian to drive Lugger to Ms. Fansler's house so he could knock on the door. Appellant pestered Brian with two or three calls a week and left phone messages for Lugger.
On March 8 appellant showed high school classmate James Gravlee a small black handgun and left it in the pickup. Appellant also asked Gravlee to find someone to knock on Ms. Fansler's door.

C. The March 9 Offenses

On March 9 appellant left Brian several messages asking where he was and whether he was going to help. Instead of returning the calls, Brian asked his dad to "go talk" to appellant. Lugger also got messages from appellant that day. Lugger did not return the calls; he felt it would be better to separate from the situation completely.
Appellant went to Gravlee's home around 7:00 that evening. Gravlee drove appellant to pick up Tracy Ledridge. On the way to Ms. Fansler's apartment, appellant told Ledridge to knock on the door so he could talk to Ms. Fansler.
When they reached the apartment complex Gravlee stayed in the car. Ledridge knocked on Ms. Fansler's door. Ms. Fansler and her dog came out. Ledridge reached down to pet the dog and "felt something brush alongside me and the door closed." Ledridge went back to the car. Gravlee gave her a $100 bill and they left.
John Benback, Ms. Fansler's boyfriend, lived in apartment no. 5 with his son, John, Jr. (J.J.) That evening Ms. Fansler's son Robert and his two sisters were with the Benback family. Ms. Fansler had taken a *447 nap there because she was afraid of appellant and felt safer at Benback's place, but returned to her own apartment to shower before work. Around 8:30 p.m. Robert and J.J. went back to Ms. Fansler's apartment. They could not get in because the deadbolt was locked and Robert had left his key upstairs. Robert knocked on the front door. He heard a muffled scream that he thought might have been a cat. The boys tried to open the rear sliding glass door but it was locked, too. They went back to the front door and knocked some more. Robert heard more muffled screams and "realized what it was." He pounded on the window, cursed and yelled words to this effect: "`Goddamn it, you better not hurt her.'" Robert told J.J. to run back to get his dad and the key.
Mr. Benback arrived and opened the door. Robert and J.J. positioned themselves outside to catch appellant if he tried to get away. J.J. spotted someone leaving; they gave chase. Both boys recognized appellant, but did not catch him.
Back in the apartment they found Ms. Fansler face up on the bed, bleeding. Police and emergency personnel responded to the scene. The apartment was "pretty well trashed. There was blood everywhere." A mirror had fallen from the wall near the bed. Two .22-caliber shell casings were found near the bed; one was on top of the fallen mirror.
Ms. Fansler was "neurologically dead" when she arrived at Ukiah Valley Medical Center. She died of a single gunshot wound, which entered above her left ear and never exited. There was a laceration on the back of Ms. Fansler's head, bruising on the neck and legs and her elbows were slightly bruised. The head laceration was due to "blunt forced trauma." The laceration spanned the entire scalp, at full thickness; there were chips of bone "in the depths" of the injury. The injury was consistent with being struck with the butt of a gun or suffering a bad fall on a sharp object.
The autopsy revealed that Ms. Fansler was pregnant. The fetus was between 11 and 13 weeks old and three to four inches long. The fetus died as a result of mother's death. The examining pathologist could not tell Ms. Fansler was pregnant just by observing her on the examination table.

D. The Aftermath

Appellant called Gravlee from a nearby store and asked for a ride back to his apartment. Appellant took off the sweatshirt he had been wearing and told Gravlee to throw it away. Appellant left; Gravlee threw the sweatshirt in the garbage.
That night appellant called Lugger around 9:30 and told him, "[I]t's done. She won't be bothering [me] anymore." Appellant also asked Lugger to kick around an alibi that the boys had seen him at a Shell station in Cloverdale.
The next morning appellant called Gravlee and asked him to retrieve a .45-caliber handgun (nine-millimeter) in some hedges a little ways from Ms. Fansler's apartment. Scared, Gravlee eventually led the police to the sweatshirt and gun and also told the police that appellant said he had shot Ms. Fansler. Police found the gun and a fanny pack with nine-millimeter and .22-caliber ammunition. A latent fingerprint analyst found appellant's right index fingerprint on duct tape around a strap attached to the holster holding the nine-millimeter gun found in the bushes. Appellant was arrested the morning of March 10.
Two months later appellant asked to speak with the lead detective. According to the detective, appellant requested help in *448 getting the death penalty. He had made peace with himself and did not want leniency; he wanted it to be over.

E. Defense

Appellant was a decorated Vietnam War veteran with extensive hardcore combat and firearms experience. As a result of his service appellant received therapy; he received compensation per classification of 100 percent mental disability, and still took antidepressants. He was diagnosed with posttraumatic stress disorder (PTSD).
When Ms. Fansler moved out, she took things he believed belonged to him, including a van on which he made a $9,000 down payment. He later learned his name was not on the title as they had agreed. Appellant denied threatening Ms. Fansler or her family during the move and denied telling Sanchez if he could not have Ms. Fansler, no one could. Appellant's daughter was present during the move and heard a little arguing, nothing serious. Appellant did not threaten Ms. Fansler, but she threw a beer bottle at his head. Later, appellant tried to talk with Ms. Fansler about the van but she refused conversation. Eventually they resumed contact and visited.
After a visit around Thanksgiving 1998, an envelope with thousands of dollars he was putting up for his daughters turned up missing. When he visited Ms. Fansler, she acknowledged having the envelope but did not return it. Instead, she gave him $500 of the money for Christmas presents. Ms. Fansler told appellant her relationship with someone else was on the rocks.
They went out on New Year's Eve. He was arrested the next morning and accused of rape. He made his court appearances and spoke with an attorney about the restraining orders. The only aspects of the restraining orders he really opposed were provisions to seek counseling and relinquish firearms. Appellant never tailgated Ms. Fansler.
Appellant testified that in early 1999, for the first time in his life, he was not able to pay his bills. He started pressing everyone for the money they owed him, but no one was coming through so he decided to go see Ms. Fansler. Others observed that he was more stressed out; something was different.
Although appellant admitted that he asked others to knock on Ms. Fansler's door, his purpose was to get back his daughter's money and find out how she was going to pay him for his investment in the van. He denied asking Lugger to destroy phones or that he drew him a diagram of Ms. Fansler's apartment.
Regarding a silencer, appellant said there was no way to put one on the .22.
On the night of March 9 appellant left the house with both guns and the fanny pack. After trying to page Brian he left the nine-millimeter and fanny pack hidden where Brian could find them, intending to page him later about the location. He had the .22 in his sweatshirt pocket, explaining that he took the gun to frighten Ms. Fansler because she was not scared of him and would use the rape allegation to keep him from getting his money.
Once at Ms. Fansler's apartment he slipped in, surprising her. She took off for the bedroom and knocked a lamp over. Ms. Fansler was leaning over; appellant reached around her and said he did not mean to scare her. The gun "went off as he reached around. They both jumped. Ms. Fansler rushed at appellant. There was a tussle and he dropped the gun as he fell against the dresser. Ms. Fansler landed on appellant. He lifted her to the bed. Ms. Fansler started yelling at him to leave. Appellant heard knocking, knelt to pick up the gun and asked, "[W]here's the money?" *449 The gun was now in his hand near her head. Ms. Fansler pushed appellant. As he stood up to leave, the "gun went off again. He never put the .22 to her head or pulled the trigger.
Stunned, appellant left through the sliding glass door. He did not recall being chased. He believed he lost the gun when he stumbled. Appellant admitted he paid Gravlee and Ledridge $100 for helping him. He did not tell Gravlee to get rid of the sweatshirt or that he shot Ms. Fansler,[4] and did not tell him anything about the guns.
Appellant did not know Ms. Fansler was pregnant; he would not have confronted her had he known. The discharge of the gun and shooting were accidents. While in jail he told his daughter the death was an accident and he wished it never happened.
During their divorce, Baxman accused appellant of molesting one of the children. There were animosities between them but they dealt with their differences in court. Eventually criminal charges were dismissed. Other women he had lived with had stolen money and/or cars from him. One was Charlotte White, Baxman's sister. During the course of that relationship, White obtained a restraining order against appellant.
Forensic psychiatrist S. Miles Estner agreed with the Veterans' Administration diagnosis of appellant as suffering from PTSD. PTSD symptoms include hypervigilance, reexperiencing phenomenon, and avoidance phenomenon. Dr. Estner believed that appellant's affliction affected him in stressful situations. In his opinion, appellant could not "think straight" under stress and overreacted to stimuli and stress, rendering him unable to focus his concentration.

F. Rebuttal

Forensic psychologist John Podboy opined that the complex nature of the behavior, planning, organization and preparation involved in the crime "point[ed] away from PTSD."

II. DISCUSSION

A. Insufficient Evidence to Support Fetal Murder Conviction

Appellant urges reversal of his second degree fetal murder conviction for insufficient evidence of implied malice. That conviction cannot stand.

1. Background

Up until 1970, California's murder statute paralleled the common law "born alive" rule, excluding from its scope the act of killing an unborn fetus. At that time, Penal Code[5] section 187 defined "murder" as "the unlawful killing of a human being, with malice aforethought." (Former § 187, enacted in 1872, was amended by Stats. 1970, ch. 1311, § 1, p. 2440 and Stats. 1996, ch. 1023, § 385.) Former section 187, in turn, was taken verbatim from the Crimes and Punishments Act of 1850, the first California statute defining murder. (Stats.1850, ch. 99, § 19, p. 231.) By the year 1850, the "born alive" common law rule had long taken hold in the United States and it was well settled that an infant had to be born alive for homicide laws to apply. (Keeler v. Superior Court (1970) 2 Cal.3d 619, 625-628, 87 Cal.Rptr. *450 481, 470 P.2d 617.) We presume that our Legislature intends to continue relevant common law rules in statutory form when, as here, it couches an enactment in the common law language. (Id. at p. 625, 87 Cal.Rptr. 481, 470 P.2d 617.)
The last case to follow the former statutory born alive rule in California was Keeler v. Superior Court, supra, 2 Cal.3d 619, 87 Cal.Rptr. 481, 470 P.2d 617, in which the defendant intercepted his former wife on a mountain road and attacked her upon visually verifying her advanced state of pregnancy by another man, saying "`I'm going to stomp it out of you.'" (Id. at p. 623, 87 Cal.Rptr. 481, 470 P.2d 617.) Ms. Keeler delivered a stillborn fetus whose skull was fractured with consequent cerebral hemorrhaging, due to the force applied to the mother's abdomen. (Ibid.) In the defendant's proceeding for a writ of prohibition to prevent the superior court from prosecuting the feticide charge, our Supreme Court held that by declaring murder to be the unlawful killing of a "human being" with malice aforethought, the Legislature did not intend to make the act of killing of an unborn fetus a crime. (Id. at p. 628, 87 Cal.Rptr. 481, 470 P.2d 617.)
Apparently repelled by the result of the Keeler decision, the Legislature acted immediately to amend section 187 to expressly provide that the unlawful killing of a fetus with malice aforethought was murder. (See Comment, Is the Intentional Killing of an Unborn Child Homicide? California Law to Punish the Willful Killing of a Fetus (1970) 2 Pacific L.J. 170, 172-175 (hereafter Comment) for a description of the remarkable legislative history of the 1970 amendment to § 187.)
Ours is a narrow feticide statute, encompassing only murder, not the lesser crime of manslaughter.[6] (See People v. Dennis (1998) 17 Cal.4th 468, 509, 71 Cal.Rptr.2d 680, 950 P.2d 1035.) The legislative history of the 1970 amendment reveals that an earlier version of the amending bill applied to both murder and manslaughter. The legislative decision to leave section 192 alone without the disjunctive "fetus" was consistent with Senate debate that the unlawful killing of a fetus should be confined to murder due to the defendant's extreme culpability and level of purpose. (Comment, supra, 2 Pacific L.J. at pp. 174, 181; People v. Brown (1995) 35 Cal.App.4th 1585, 1592, 42 Cal.Rptr.2d 155.) Thus, omission of the word "fetus" from the manslaughter statute involved the exercise of legislative judgment, not the absence of legislative oversight. (See Comment, supra, 2 Pacific L.J. at pp. 172-175, 181; People v. Apodaca (1978) 76 Cal.App.3d 479, 487, 142 Cal.Rptr. 830, disapproved on other grounds in People v. Davis (1994) 7 Cal.4th 797, 804, 30 Cal.Rptr.2d 50, 872 P.2d 591.)
Years later, in People v. Davis, supra, 7 Cal.4th 797, 30 Cal.Rptr.2d 50, 872 P.2d 591 our Supreme Court held that viability is not an element of fetal murder under section 187, subdivision (a). Rather, "the Legislature could criminalize murder of the postembryonic product without the imposition of a viability requirement." (Id. at p. 810, 30 Cal.Rptr.2d 50, 872 P.2d 591.)
When the charge is second degree murder of a fetus, malice aforethought must be proved separately as to the fetus. (People v. Dennis, supra, 17 Cal.4th at pp. 514-515, 71 Cal.Rptr.2d 680, 950 P.2d 1035 [assuming also that notion of transferred intent, wherein malice toward mother would satisfy element of malice for *451 fetal murder, does not apply].) Malice may be express or implied. (§ 188.) It is implied "when the killing results from an intentional act, the natural consequences of which are dangerous to life, which act was deliberately performed by a person who knows that his conduct endangers the life of another and who acts with conscious disregard for life." (People v. Dellinger (1989) 49 Cal.3d 1212, 1215, 264 Cal.Rptr. 841, 783 P.2d 200; People v. Jones (2000) 82 Cal.App.4th 663, 667, 98 Cal.Rptr.2d 724.) This is the language tracked in CALJIC No. 8.II,[7] the standard instruction defining implied malice and approved in People v. Dellinger, supra, 49 Cal.3d at pages 1221-1222, 264 Cal.Rptr. 841, 783 P.2d 200.
Unlike criminal negligence, the implied malice determination entails a subjective assessment of whether the defendant actually appreciated the risk involved. (People v. Watson (1981) 30 Cal.3d 290, 296-297, 179 Cal.Rptr. 43, 637 P.2d 279.) Stated somewhat differently, implied malice has physical and mental components, "the physical component being the performance of `"an act, the natural consequences of which are dangerous to life,"' and the mental component being the requirement that the defendant `"knows that his conduct endangers the life of another and ... acts with a conscious disregard for life."'" (People v. Hansen (1994) 9 Cal.4th 300, 308, 36 Cal. Rptr.2d 609, 885 P.2d 1022.)
In People v. Brown, the trial court delivered modified implied malice instructions to refer specifically to a human fetus. (People v. Brown, supra, 35 Cal.App.4th at p. 1595, 42 Cal.Rptr.2d 155 & fn. 3) There, the reviewing court sustained the second degree fetal murder conviction on the following evidence: an unprovoked attack by the defendant on the mother, triggered by a phone call reflected on her pager. The defendant repeatedly kicked, hit and punched the mother in the stomach and elsewhere, saying "`Fuck that baby'" and "`I'll kill you.'" (Id. at p. 1599, 42 Cal. Rptr.2d 155.) These declarations "evidenced [defendant's] complete disregard for the harm he was causing both to [the mother] and the fetus. Regardless whether the governing standard be his knowledge of the natural consequences of his acts were dangerous to fetal life or his recognition of the `high probability of death' to the fetus, his intentional, callous and repetitive kicking and punching of a pregnant woman in her abdomen while yelling he neither cared about the baby nor her supported the jury's conclusion he acted with conscious disregard of the danger to fetal life he was causing." (Ibid.)

2. Analysis

On the prosecutor's motion, the court changed count two from first degree to second degree murder of the fetus and instructed the jury on implied malice.[8] Further, the prosecutor resisted trying the case on a transferred intent theory, making it clear that "[transferred intent is not an issue in second degree murder. It's not *452 an issue in this case at all."[9] Instead, the prosecutor promoted an implied malice/zone of danger analysis.
We agree with appellant that the fetal murder charge does not stand up to the implied malice theory advanced in this case. The evidence supports the physical component, but not the mental component. There is not an iota of evidence that appellant knew his conduct endangered fetal life and acted with disregard of that fetal life. It is undisputed that the fetus was 10 to 13 weeks old; the pregnancy was not yet visible and appellant did not know Ms. Fansler was pregnant.
Relying on People v. Roberts (1992) 2 Cal.4th 271, 6 Cal.Rptr.2d 276, 826 P.2d 274, the People insist that appellant should be held liable for the unintended murder of the fetus upon the foreseeability of the consequences of his conduct on March 9. In Roberts, the defendant stabbed and wounded a prison inmate in a hallway. The dazed inmate pursued his attackers and fatally stabbed a prison guard before he died. The defendant was convicted of several offenses, including the first degree murders of the inmate and guard.
Roberts is a proximate cause case. The court reviewed the few cases in the annals of American criminal law, where principles of proximate cause assign criminal liability for the death of a third party resulting from a second person's impulsive reaction to the defendant's dangerous act. In each case the defendant was charged with murder but found guilty of manslaughter, or with first degree murder and convicted of second degree murder. (People v. Roberts, supra, 2 Cal.4th at pp. 317-320, 6 Cal.Rptr.2d 276, 826 P.2d 274.) Concluding there was insufficient evidence to find the defendant liable for first degree murder of the guard but sufficient evidence to find that his act was the proximate cause of the guard's murder, the court nonetheless reversed the conviction because of a constitutionally erroneous instruction. (Id. at pp. 315, 320-322, 6 Cal.Rptr.2d 276, 826 P.2d 274.)
Roberts does not aid the People. First, this is not a causation case; in particular, this case does not involve issues of a second party's impulsive reaction or an intended victim's killing of a third person. Second, the evidence of causation was deemed sufficient in Roberts because the guard was in the vicinity in which harm foreseeably could occur as result of a prison stabbing. (People v. Roberts, supra, 2 Cal.4th at p. 321, 6 Cal.Rptr.2d 276, 826 P.2d 274.) The People urge us to hang implied malice liability on the theory that it was reasonably foreseeable that Ms. Fansler might be pregnant: "When one starts shooting women of child-bearing years, it is reasonably foreseeable the victim might be pregnant. This is particularly true when a perpetrator shoots a woman whom he knows is fertile, is dating other men, and is presumably sexually active."
We will not adopt a theory that leans more toward strict liability than implied malice. The undetectable early pregnancy was too latent and remote a risk factor to bear on appellant's liability or the gravity of his offense. (See People v. Roberts, *453 supra, 2 Cal.4th at pp. 319-320, 6 Gal. Rptr.2d 276, 826 P.2d 274.) Contrast the speculative nature of the risk factor here with the classic example of indiscriminate shooting/implied malice recited in Roberts: The actor who fires a bullet through a window, not knowing or caring if anyone is behind it, may be liable for homicide regardless of intent to kill. (Id. at p. 317, 6 Cal.Rptr.2d 276, 826 P.2d 274.) The risk there is high and patent, not latent, speculative and remote.
Finally and most importantly, were we to adopt the People's position, we would dispense with the subjective mental component of implied malice. Where is the evidence that appellant acted with knowledge of the danger to, and conscious disregard for, fetal life? There is none. This is dispositive.
Avoiding the issue, the People posit that there is no requirement under our fetal murder statute that the defendant display indifference to fetal life, rather than human life in general, arguing that Dennis supports this conclusion. Responding to the defendant's argument that the jury instructions were deficient because they did not separately define malice in terms that related specifically to a fetus, the Supreme Court in Dennis held that the instructions as a whole "made [it] plain that malice was a separate element that had to be proved for each of the two murders charged. The trial court instructed the jury that a verdict of guilt of the alleged fetal murder required a finding that defendant killed the fetus with malice aforethought.... It is not reasonably likely the instructions misled the jury into thinking it could convict defendant of two murders while finding malice aforethought only as to one victim's death." (People v. Dennis, supra, 17 Cal.4th at pp. 514-515, 71 Cal.Rptr.2d 680, 950 P.2d 1035.) Far from supporting respondent's theory, the Dennis opinion assumes it would be error to instruct the jury that the defendant need not display malice toward the fetus or fetal life generally. (See also People v. Bunyard (1988) 45 Cal.3d 1189, 1230-1232, 249 Cal.Rptr. 71, 756 P.2d 795 [express malice instructions collectively required that defendant act with specific intent to kill fetus, not just mother]; People v. Brown, supra, 35 Cal.App.4th at pp. 1595 & fn. 3, 1598-1599, 42 Cal.Rptr.2d 155 [implied malice instruction modified to refer to human fetus; opinion assumes implied malice must be shown as to fetal life].)
The People also suggest that People v. Davis, supra, 7 Cal.4th 797, 30 Cal.Rptr.2d 50, 872 P.2d 591 and People v. Henderson (1990) 225 Cal.App.3d 1129, 1158, 275 Cal. Rptr. 837 imply that fetal murder can be found without the defendant's knowledge of the pregnancy or awareness of risk of harm to fetal life. However, Davis is a felony-murder case; malice is not an element of felony murder. (People v. Dillon (1983) 34 Cal.3d 441, 475, 194 Cal.Rptr. 390, 668 P.2d 697.) Moreover, the defendant in Henderson knew the victim mother, who was carrying a 27-to-28 week-old fetus. (People v. Henderson, supra, 225 Cal.App.3d at pp. 1137, 1140-1141, 275 Cal. Rptr. 837.) The defendant had lived with the mother and her husband some six weeks before robbing and killing them and the fetus. (Id. at pp. 1143-1144, 275 Cal. Rptr. 837.) Thus, there was ample evidence to infer that the defendant was well aware of the pregnancy.
Finally, the People offer the public policy argument that to require defendant to harbor implied malice toward fetal life would unduly denigrate fetal life. They throw out the example of a gang member who kills a rival gang member in a driveby shooting, accidentally also shooting a pregnant woman, resulting in death of the *454 fetus upon miscarriage. Absent conscious disregard for fetal life, the defendant would not be liable for fetal homicide. If the same perpetrator had accidentally killed another human, there would be no question of implied malice toward the unintended human victim. Thus, according to respondent, the fetus is afforded less protection than human life, and the defendant gets a "free ride" for the fetal death.
First, this is not our case. The example invokes a zone of danger analysis based on indiscriminate, provocative drive-by shooting. The risk stemming from the act of shooting in the two scenarios is very different, as is the analysis of culpability. Second, unknown fetal life and human life are also very different in terms of the risk of endangerment to life appreciated by a defendant. As contrasted to the risk to human life, the risk to unknown fetal life is latent and indeterminate, something the average person would not be aware of or consciously disregard.
In any event, as in Davis, a defendant may be prosecuted for fetal murder regardless of knowledge of the pregnancy when the facts support a felony-murder theory. This is because the Legislature has designated certain felonies so inherently dangerous that death in the course of their commission or completion constitutes first degree murder. (§ 189; People v. Roberts, supra, 2 Cal.4th at p. 317, 6 Cal. Rptr.2d 276, 826 P.2d 274.) Ironically, murder itself is not one of them.
Third, the Legislature has some experience with the issue of knowledge of pregnancy with respect to the enactment of section 12022.9, the sentence enhancement for infliction of injury upon a pregnant woman resulting in termination of the pregnancy. (§ 12022.9, subd. (a).) While not an alternative to the charge of fetal murder in violation of section 187, section 12022.9 imposes a five-year enhancement for any felony committed against a pregnant woman resulting in termination of her pregnancy. The enhancement only applies where the offender "knows or reasonably should know that the victim is pregnant." (§ 12022.9, subd. (a).)
For all these reasons, we conclude the second degree fetal murder conviction cannot stand and must be reversed for insufficient evidence.[10]
B.-D.[**]

III. DISPOSITION
The judgment is affirmed as to the murder of Ms. Fansler but reversed as to the fetal murder count.
We concur: KAY, P.J, and RIVERA, J.
NOTES
[*] Pursuant to California Rules of Court, rules 976(b) and 976.1, this opinion is certified for publication with the exception of parts II.B. through II.D.
[1] All further dates are in the 1999 calendar year unless otherwise indicated.
[2] Ms. Fansler lived in Mendocino County but worked in Lake County.
[3] Mr. Fansler came to Ukiah from Arizona at Ms. Fansler's request because she was scared and needed his help. Mr. Fansler would drive her to work, wait for her until she "got off," take her to the grocery store and anything else she needed.
[4] Rather, he told Gravlee he could have the sweatshirt because he no longer wanted it. Further, when Gravlee asked how it went, he said, "`It was bad, James. It all went wrong.'"
[5] All further statutory references are to the Penal Code unless otherwise indicated.
[6] Manslaughter is still defined as "the unlawful killing of a human being without malice." (§ 192.)
[7] 6th edition 1996, bound volume, unchanged from 5th edition 1988, bound volume.
[8] Specifically, the court instructed that malice is implied when "one, the killing results from an intentional act; two, the natural consequences of the act are dangerous to human life; and, three, the act was deliberately performed with knowledge of the danger to and with conscious disregard for human life." Further, the court instructed that "[m]urder of the second degree is the unlawful killing of a human being or fetus with malice aforethought when the perpetrator intended unlawfully to kill a human being or human fetus, but the evidence is insufficient to prove deliberation and premeditation."
[9] We note that the Supreme Court recently held that the doctrine of transferred intent may be applied to unintended victims even when the intended target is killed. (People v. Bland (2002) 28 Cal.4th 313, 317, 321-324, 121 Cal.Rptr.2d 546, 48 P.3d 1107.) Because the theory of transferred intent was abandoned by the prosecutor, we need not and do not decide whether the reasoning of Bland would prevail in a fetal murder case where the pregnancy is undetectable to the human eye and the defendant has no knowledge of it. Dennis, in requiring that malice be directed toward the fetus and not just the mother, seems to suggest that the doctrine would be inapplicable.
[10] Because the fetal murder fails for lack of substantial evidence, we need not address appellant's additional claim of reversible error in denying his motion to dismiss that count for vindictive pretrial charging.
[**] See footnote *, ante.